1
2
3
4
5

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

6    RANDALL HIX, *et al.,*

7           Plaintiffs,                                    Case No. 3:18-cv-00437-RCJ-WGC

8    v.                                                              **ORDER**

9    ZIMMER BIOMET HOLDINGS, INC, *et al*.,

10          Defendants.

11

12          In 2010, Randall Hix had an artificial hip replacement using a Biomet M2a Magnum implant.

13   Hix and his wife, Liana Hix, brought this suit against Defendants Zimmer Biomet Holdings, Inc.,

14   Biomet, Inc., Biomet Orthopedics, LLC, and Biomet U.S. Reconstruction, LLC, (collectively

15   "Biomet") alleging the artificial hip device was defective.  (Amended Complaint, ECF No. 201).

16   Presently before the Court is Biomet's Motion for Summary Judgment (ECF No. 273).  Hix opposes

17   the motion.  (ECF No. 291).  The Court will grant the motion in part and deny it in part.[1]

18   **I.   PROCEDURAL HISTORY**

19          On October 2, 2012, the Judicial Panel on Multidistrict Litigation transferred the first actions

20   regarding Biomet M2a Magnum hip implants to the Northern District of Indiana as the Biomet M2a

21   Magnum Hip Implants Products Liability multi-district litigation, MDL Case No. 3-12-md-2391.  In

22

---

23   [1] Biomet has also moved for leave to file excess pages in its reply (ECF No. 299).  The Court notes
     that Biomet did file a reply with excess pages, but such was done in response to Hix's opposition,
24   which also had excess pages.  The Court will grant the motion to make clear that the additional pages
     filed by Biomet in its reply as appropriate in context of this matter.

February 2013, the MDL court entered an order allowing parties to file new actions directly into the MDL action.  In March 2014, Hix initiated this action by filing a complaint in the Biomet M2a Magnum MDL.  Following consolidated pre-trial proceedings primarily directed to common-issue discovery and to some case-specific discovery, the MDL court transferred this matter to the District of Nevada in September 2018.

**II.  BACKGROUND**

On July 12, 2010, Hix (then 36 years old) had a total hip arthroplasty (THA, i.e., joint replacement) performed by Dr. Richard Mullins.  Dr. Mullins implanted the Biomet M2a Magnum metal-on-metal (MoM) artificial hip device.

Prior to the THA procedure, Hix had surgery in 1997 on his left hip due to a Slipped Capital Femoral Epiphysis when he was 13 years old.

In 2008, Hix began experiencing pain in his left hip that worsened over time.  In March 2010, Hix was arthroscopically treated for left hip femoroacetabular impingement.  When the procedure did not resolve Hix's pain, he was referred to Dr. Mullins, who recommended a total left hip replacement.  Hix and Dr. Mullins met with a Biomet sales representative who demonstrated Biomet's sample hip prosthetics.  Dr. Mullins thought that a metal-on-metal device would provide Hix a better quality of life – and would last longer – than a metal-on-polyethylene device.  Hix decided to have the M2a Magnum MoM device implanted.

Following the THA procedure, Hix began again experiencing pain in his left hip in March 2012.  He saw Dr. Suzanne Zsikla, who referred Hix to Dr. Richard Blakey, an orthopedic surgeon.  Hix saw Dr. Blakey in August 2012.  A radiograph was taken, showing the MoM implant with reactive bone at the end of the stem.  A presumptive diagnosis of metallosis[2] was made.

---

[2] In his deposition, Hix's treating physician, Dr. Blakey, described metallosis as an inflammatory reaction to the wear product of an MoM device.

A bone scan performed on September 5, 2012, indicated Hix's hip was normal and did not indicate an abnormal uptake. On September 11, 2012, Dr. Blakey indicated he was fairly certain Hix did not have an infection and recommended a revision of the Biomet M2a Magnum MoM hip device.

Dr. Blakey performed the revision surgery on Hix's left hip on October 31, 2012. Dr. Blakey removed the Biomet acetabular cup and replaced it with a Zimmer metal-on-polyethylene constrained hip construct. He also removed damaged tissue and implanted a constrained liner to reduce the chance of dislocation or subluxation. Dr. Tony Yang examined the removed tissues for pathology and noted chronic inflammation, reactive hyperplasia, and pigmented macrophages containing a grayish pigment consistent with foreign material. Dr. Blakey's post-operative diagnosis noted painful left metal-on-metal total hip secondary to metallosis.

Two weeks after this surgery, Hix had an MRI of his lumbar spine, which showed an L5-S1 right-sided paracentral disc protrusion causing mild stenosis of the right neural foramina.

On January 10, 2013, Hix was seen by Dr. Blakey as Hix had "developed some cellulitis about the left hip wound." Dr. Blakey informed Hix that he might need to aspirate the hip. This procedure was performed on January 24, but produced "little fluid, if any." Cultures on the fluid were negative for infection. Hix was continuing to have pain when he had an office visit with Dr. Blakey in June 2013. Dr. Blakey "talked to [Hix] about the fact that sometimes the metallosis reaction comes back even though we have revised the hip." Dr. Blakey performed another left-hip aspiration in August 2013 and gave Hix a steroid injection.

Hix had a follow-up visit a week later. Dr. Blakey recorded in his notes: "I suspect that he is having continued inflammation, possibly from the metallosis." Following an office visit two weeks later, Dr. Blakey noted there was not much else he could do for Hix's pain.

Hix continued to have pain through 2014.  In November 2014, Hix saw Dr. Martin Arraiz, who noted radiculitis (pain radiating along a nerve resulting from inflammation at the root of the nerve connecting to the spine) in the lower left extremity.  Hix received an epidural injection in December 2014.

Hix saw Dr. Blakey in January 2015.  Dr. Blakey noted Hix "is actually getting better with respect to his left hip.  He is still having pain."  Following a July 2015 office visit, Dr. Blakey noted "Hix has had increasing pain in his left hip revision last month."

On October 21, 2017, Hix went to the emergency room the day following "kicking an object . . . with his left leg" that resulted in "sudden onset pain left hip."  The emergency doctor noted a final impression of "[p]ain of left hip joint" and "[d]islocation of left hip."

Two days later, Dr. Chad Watts performed a revision surgery on Hix's left hip for "failed constrained liner with dislocation of left total hip."  Dr. Watts removed the cup with constrained liner and replaced it with a "62 Biomet OsseoTi shell with dual mobility liner" and "2B +6 revision ceramic head with a titanium sleeve."  Dr. Watts notes indicate that Hix "was very scarred in and had a pretty stiff hip.  There was some metal staining from his prior metallosis, but overall the muscle and tissues were in reasonable shape."  He further noted the "constrained liner was broken – there had clearly been chronic impingement which led to failure."

Four weeks after the surgery, Hix visited the emergency room with "pain to the surgical site, redness, and drainage around surgical incision associated with fever (102.0 deg F) and chills."  Hix underwent surgery the following day to open the surgical wound for "drainage with debridement and placement of wound VAC."  Two days later, Dr. Robert Crouse performed another surgery.  As Hix had "an obvious deep infection," Dr. Crouse removed the artificial hip devices, removed infected material for biopsy and culture, and performed a femoral osteotomy.  Dr. Crouse further placed an antibiotic impregnated cement spacer in the acetabulum, the location of the infection.  The material

4

removed for culture showed growth for Staphylococcus lugdunensis, with 1 of 3 cultures showing growth for Methicillin-Resistant Staphylococcus aureus.  Hix remained on IV antibiotics for six weeks.

On February 8, 2018, Dr. Watts implanted an artificial hip consisting of a Stryker Restoration cup and stem with a ceramic head and cable.

Hix had an office visit with Dr. Ali Nairizi in June 2018 for pain management.  Over the following year, Hix underwent a femoral nerve block, lumbar sympathetic nerve block, and SI joint injections with corticosteroids for pain.

In September 2019, Dr. Denis Patterson implanted a temporary dorsal root ganglion spinal cord stimulator for pain management and implanted a permanent stimulator the next month.

In November, Hix had an office visit with Dr. Watts, reporting a significant increase in pain and redness and swelling around the left hip.  Dr. Watts recorded the impression of "[l]ikely infected left hip replacement."  Dr. Watts aspirated the left hip.  A culture of the withdrawn material indicated a streptococcus viridans infection.  Hix underwent surgery on his left hip the following day, with Dr. Watts performing a tissue debridement and irrigation, and exchanging the MDM liner, the ceramic head and MDM head.  On December 1, 2019, Dr. Watts performed another debridement and irrigation of the hip.  Hix was hospitalized for the infected left hip from November 22, through December 11, 2019.

In May 2020, Dr. Patterson exchanged the implantable power generator for the nerve stimulator.

**III. SUMMARY JUDGMENT**

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).  As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however, will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

## IV. DISCUSSION

### A.  Negligent Misrepresentation

The Court will grant summary judgment in favor of Biomet on Hix's negligent misrepresentation claim because Hix has expressly consented to dismissing this claim.

### B.  Medical Causation

To establish medical causation, a plaintiff must produce medical expert testimony opining to a reasonable degree of medical certainty that the allegedly defective product caused the plaintiff's injury.  *See Morsicato v. Sav–On Drug Stores, Inc.*, 111 P.3d 1112, 1116 (Nev. 2005); *United Exposition Serv. Co. v. State Indus. Ins. Sys.*, 851 P.2d 423, 425 (Nev. 1993).  A possibility that the product caused the injury is insufficient.  *United Exposition Serv. Co.*, 851 P.2d at 425.  Nevada requires such expert testimony because "if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a

7

1  jury can make a decision with sufficient certainty so as to make a legal judgment." *Morsicato*, 111

2  P.3d at 1116 (internal quotation marks omitted).

3        Biomet argues that Hix cannot offer expert testimony of medical causation on the assumption

4  that this Court will grant their motions in limine to exclude his retained experts and treating

5  physicians from offering any medical causation testimony.  The argument fails because the Court

6  has, contemporaneous with this decision, denied Biomet's motions in limine to exclude expert

7  testimony regarding medical causation.

8        Biomet further argues that summary judgment is proper as to all claims because no single

9  expert establishes a causal link between the asserted defects in the M2a Magnum to Hix's injuries.

10  The argument fails because Hix is not limited to meeting his burden of proof through a single expert.

11  Hix has offered sufficient expert testimony, through his several experts, to raise triable issues of fact

12  whether the M2a Magnum hip device was defective, whether he was injured, and whether the

13  identified defects caused the asserted injuries.

14  **C.  Strict Products Liability – Failure to Warn**

15        To establish a strict products liability claim under Nevada law, a plaintiff must show: "1) the

16  product had a defect which rendered it unreasonably dangerous, 2) the defect existed at the time the

17  product left the manufacturer, and 3) the defect caused the plaintiff's injury." *Fyssakis v. Knight*

18  *Equip. Corp*., 826 P.2d 570, 571 (Nev. 1992).  A product is defective if it is unreasonably dangerous.

19  *Stackiewicz v. Nissan Motor Corp. in U.S.A*., 686 P.2d 925, 928 (Nev. 1984).   A product is

20  unreasonably dangerous if it fails to perform "in the manner reasonably to be expected in light of

21  [its] nature and intended function" and "was more dangerous [than] would be contemplated by the

22  ordinary user having the ordinary knowledge available in the community." *Allison v. Merck & Co.,*

23  *Inc*., 878 P.2d 948, 952 (Nev. 1994) (quotations omitted); *Stackiewicz*, 686 P.2d at 928.  Evidence

24

8

1    the product in question "lacked adequate safety features or that a safer alternative design was feasible

2    at the time of manufacture will support a strict liabilities claim." *Fyssakis*, 826 P.2d at 572.

3           "Where the defendant has reason to anticipate that danger may result from a particular use

4    of his product, and he fails to warn adequately of such a danger, the product sold without a warning

5    is in a defective condition.  Strict liability may be imposed even where the product is faultlessly

6    made, if it was unreasonably dangerous to place the product in the hands of the consumer without

7    adequate warnings concerning its safe and proper use." *Oak Grove Investors v. Bell & Gossett Co.*,

8    668 P.2d 1075, 1080 (Nev. 1983)).

9           Under Nevada law, when a duty to warn arises, an adequate warning must "(1) be designed

10   to reasonably catch the consumer's attention; (2) be comprehensible and give a fair indication of the

11   specific risks attendant to use of the product; and (3) be of sufficient intensity justified by the

12   magnitude of the risk." *See Lewis v. SeaRay Boats, Inc.*, 65 P.3d 245, 250 (Nev. 2003).  The warnings

13   must communicate adequately any dangers that may result from the products use or foreseeable

14   misuse.  *Fyssakis*, 826 P.2d at 571–72.  Whether the defendant gave adequate warnings usually is a

15   jury question.  *Oak Grove Investors*, 668 P.2d at 1080.

16          In the context of prescription medications, Nevada has adopted the learned intermediary

17   doctrine in failure-to-warn cases.  *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1158–59 (Nev. 2011).

18   Pursuant to this doctrine, "a drug manufacturer is immune from liability to a patient taking the

19   manufacturer's drug so long as the manufacturer has provided the patient's doctor with all relevant

20   safety information for that drug."  *Id*.  The learned intermediary doctrine recognizes that "the doctor

21   is in the best position to warn the customer of a given medication's generalized risks."  *See id*.

22          Courts within the Federal District Court of Nevada, including this Court, have determined

23   that the Nevada Supreme Court will likely extend the doctrine into the medical device context.  *See*

24   *Carter v. Ethicon, Inc.,* No. 2:20-CV-1232-KJD-VCF, 2021 WL 1226531, at *4 (D. Nev. Mar. 31,

2021) ("While the Nevada Supreme Court has yet to extend the learned intermediary doctrine to a prescription medical device action, the Federal District Court of Nevada has repeatedly done so"); *Phillips v. C.R. Bard, Inc.*, No. 3:12-cv-00344-RCJ-WGC, 2014 WL 7177256, at \*9 (D. Nev. Dec. 16, 2014) (holding that doctrine applied to implanted filter manufacturer who had no duty to warn consumer of dangers about which it warned the physician).  In doing so, these federal district courts have noted that the *Klasch* court's main justification for applying the doctrine to pharmacists applies equally to medical device manufacturers: because it is "up to the patient's doctor – who has the benefit of knowing the patient's specific situation – to convey to the patient any information that the doctor deems is relevant."  *Heinrich v. Ethicon, Inc.*, 455 F. Supp. 3d 968, 974 (D. Nev. 2020) (quoting *Klasch*, 264 P.3d at 1158).

Biomet argues that the learned intermediary doctrine should apply in this case and that it adequately warned Hix's learned intermediary – Dr. Mullins – of all risks underlying Hix's claims through the M2a Magnum IFU.  Hix counters that the learned intermediary doctrine does not apply because a Biomet sales representative met personally with Hix and Dr. Mullins to demonstrate sample prosthetics.  Further, even if the Court applies the learned intermediary doctrine in this case, Hix argues that a jury issue remains whether the warnings in the M2a Magnum IFU were adequate.

The Court disagrees with Hix that the learned intermediary doctrine does not apply in this case merely because a Biomet sales representative met with Hix and Dr. Mullins to demonstrate sample prosthetics.  In noting the policy considerations for adopting the doctrine in the context of pharmacists, the Nevada Supreme Court stated that "between the doctor and the pharmacist, the doctor is in the best position to warn the customer of a given medication's generalized risks.  Or, viewed more pragmatically, the doctrine prevents pharmacists from constantly second-guessing a prescribing doctor's judgment simply in order to avoid his or her own liability to the customer." *Klasch*, 264 P.2d at 1159.  The Nevada Supreme Court also noted that the doctrine did "not foreclose

a pharmacist's potential for liability when the pharmacist has knowledge of a customer-specific risk. Instead, under these circumstances, a pharmacist has a duty to exercise reasonable care in warning the customer *or* notifying the prescribing doctor of the risk." *Id.* at 1158 (emphasis added).  For similar reasons, the Court finds that in the context of medical devices, the learned intermediary doctrine continues to recognize that the doctor is in the best position to warn the customer of risks relevant to the medical device.  However, that does not abrogate a manufacturer's duty to adequately warn the doctor of the risks known to the manufacturer, whether generalized for the medical device or specific to a customer.  The meeting between Biomet's sales representative and Hix and his doctor did not transform Biomet's duty to warn Hix's doctor into a duty to directly warn Hix.  Hix has the burden of showing that Biomet failed to adequately warn his doctor of the generalized risks relevant to the M2a Magnum hip implant device, and to show that Biomet failed to adequately warn *both* Hix and his doctor of any risks specific to Hix of which Biomet was aware, if any.

Biomet asserts that the Information for Use (IFU) that accompanied the M2a Magnum warned of wear, warned of elevated metal ion levels or particulate, warned of material sensitivity reactions, and warned of post-operative infections.  The Court agrees that the IFU does contain language relevant to each of these items.  However, Biomet has not shown that the language in the IFU constitutes an adequate warning as a matter of law.  Biomet has not established, as a matter of law, that the IFU was designed to reasonably catch the consumer's attention (in this case, the doctor's attention) regarding the risks relevant to this matter.  Nor has Biomet established, as a matter of law, that the IFU was not only comprehensible but that it gave a fair indication of the specific risks attendant to use of M2a Magnum.  Finally, Biomet has not established, as a matter of law, that the language of its IFU was "of sufficient intensity justified by the magnitude of the risk" relevant to this matter.  Mere inclusion of some language regarding the risks in the IFU does not establish that

11

1   an adequate warning was given.  Rather, this is an issue generally reserved for resolution by the jury.

2   Accordingly, the Court will not grant summary judgment to Biomet on Hix's failure to warn claims.

3   **D.  Timely Notice of Breaches of Warranty**

4   Biomet argues that Hix's claims for breaches of express warranty, implied warranty for

5   fitness for a particular purpose and implied warranty of merchantability should be dismissed for lack

6   of notice.  To pursue a warranty claim, the buyer must "seasonably notif[y] the seller" of the breach.

7   *See* Nev. Rev. Stat. § 104.2602(1).  "[I]f, after acceptance of the goods, the buyer fail[s] to give

8   notice to the seller of the breach or any promise or warranty within a reasonable time after the buyer

9   knows, or ought to know, of such breach, the seller shall not be liable thereunder." *Chiquita Mining*

10  *Co. v. Fairbanks, Morse & Co.*, 104 P.2d 191, 195 (Nev. 1940).

11  Biomet relies on Hix's deposition testimony in which Hick acknowledged that he did not

12  speak – and that to his knowledge his doctor did not speak – to anyone at Biomet about his hip

13  implant and revision surgery.  However, Scott Christensen, a sales representative for Biomet,

14  testified that he was present at the revision surgery.  This raises a genuine issue of fact whether

15  Biomet was notified of the revision surgery.

16  Biomet further argues that summary judgment for lack of notice of the warranty claims is

17  appropriate because Hix has not specifically identified the express warranty that was breached and

18  has not indicated whether he is still pursuing his implied warranty claims.  Biomet relies solely on

19  Hix's answer to Interrogatory 16 requesting Hix to identify each warranty, describe the method of

20  communication for any claim of express warranty, describe the alleged defect, state whether notice

21  was given as well as the date, manner, and person to whom notice was given.  Hix responded by

22  referring the Defendants to the expert reports to be produced in the litigation.  The Court finds that

23  the record developed in this motion for summary judgment sufficiently raises an issue of fact whether

24

1   Hix notified Biomet of his breach of warranty claims.  The Court will deny Biomet summary

2   judgment as to the warranty claims.

3   **E.   Consumer Protection Act Claim**

4   Biomet argues that Hix cannot show that he justifiably relied on any materials from Biomet

5   which caused his injuries.  Biomet argues that, in response to an interrogatory, Hix "represented that

6   the only information given to him about the product was '[g]eneral post-operative instructions such

7   as physical limitations during recovery, care for the surgical site, and hip rehabilitation and/or

8   physical therapy, etc.'"  The Court notes, however, that Hix further responded to that interrogatory

9   by referring to his "Fact Sheet and Plaintiff's deposition taken been taken [sic] in this matter."  As

10  Hix testified in his deposition, he and his doctor met with sales representatives from Biomet.  Hix

11  was asked, "You didn't select the Biomet M2a implant based on any statements Biomet employees

12  or representatives made, right?"  Hix responded, "Other than that they mirrored the statements that

13  were being made by my physician."

14  Regarding the statements made to Hix, the following exchange occurred during Hix's

15  deposition:

16  Q:    And I guess I mean more about the type of hip you're going to use rather
        than going forward or not with the surgery?

17

18  A:    At that time what was presented to me was the old school method, quote
        unquote, metal on plastic.  At that time I didn't understand polyethylene, or we
        could go with new technology, metal on metal which was the M2a Magnum hip.

19

20  Q:    Okay.  And did he give you risks and benefits associated with both?

21  A:    Yes.

22  Q:    Okay.  And how come you didn't choose the metal on polyethylene?

23  A:    Because it was explained that my quality of life because of my age would
        be better with the newer technology and that I'd have more range of motion and
        perhaps more activity level.

24

    Q:    Did he also explain that it could last longer?

13

A:    Yes, and that the polyethylene, or the plastic as it was put at that time, would wear out quicker.

Q:    Okay.  And do you remember what the time periods were?

A:    He told me the Magnum, I'd probably get 25 years.  On the plastic, probably maybe 15.

Q:    After speaking with Dr. Mullins and these fellows from Biomet, did you go home and do any research?

A:    No.

Q:    Did you talk to anybody to help you make a decision, or did you make your decision based on what was presented to you by Dr. Mullins and the Biomet folks?

A:    I made my decision for the most part based on what was presented to me and discussed it with my wife, but I had pretty much decided to go that direction on my own.

Q:    And was Dr. Mullins leaning towards and suggesting the metal on metal?

A:    Yes.

Biomet asserts that "there is no evidence whatsoever in the record that Dr. Mullins reviewed or relied on any Biomet materials when selecting the device for Mr. Hix."  The Court notes, however, that Dr. Mullins testified that he was sure that he probably had, at some point, reviewed the IFU that came with the M2a Magnum.  As previously noted, Hix testified that Dr. Mullins attended the meeting at which a representative (or representatives) from Biomet demonstrated the M2a Magnum and "mirrored" what Dr. Mullins was saying regarding the metal-on-metal implant.  Hix has sufficiently raised an issue of fact whether he justifiably relied on representations made by Biomet in his selection of the M2a Magnum rather than a metal-on-polyethylene device.  The Court will deny summary judgment on Hix's Consumer Protection Act claim.

14

1

**F.      Punitive Damages**

2        Under Nevada law, punitive damages are permitted if compensatory damages are recovered,

3    and the plaintiff meets their burden of proof.[3]  *Betsinger v. D.R. Horton, Inc.*, 167, 232 P.3d 433,

4    436 (Nev. 2010).   The plaintiff must demonstrate "by clear and convincing evidence that the

5    defendant has been guilty of oppression, fraud or malice, express or implied" in order to recover.

6    Nev. Rev. Stat. § 42.005 (2021).  Express malice is defined as "conduct which is intended to injure

7    a person." Nev. Rev. Stat. § 42.001(3), *Wyeth v. Rowatt*, 473, 244 P.3d 765, 783 (Nev. 2010)

8    (manufacturer acted with malice by attempting to hide harmful consequences of its products).  The

9    statute is not limited to express malice but also broadly permits a showing of implied malice, which

10   is defined as "despicable conduct which is engaged in with a conscious disregard for the rights and

11   safety of others." Nev. Rev. Stat. § 42.001(3).  Conscious disregard is defined as "knowledge of the

12   probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid

13   those consequences."  Nev. Rev. Stat. § 42.001(1), *Countrywide Home Loans, Inc. v. Thitchener*,

14   192 P.3d 243, 253–55 (Nev. 2008) (Punitive damages award upheld against a company that ignored

15   warning signs of potential errors, finding there was clear evidence of a willful and deliberate failure

16   on their part to avoid harm).  The statute's definition of conscious disregard does not require proof

17   of the defendant's actual knowledge, but the defendant's conduct must exceed recklessness or gross

18   negligence. *Id*. at 255.

19       The Court disagrees with Biomet's characterization that Hix's claims rest "entirely on

20   speculative and conclusory allegations."  As relevant to the claim for punitive damages, a significant

21

22   [3]     While Biomet argues that Indiana law should govern Hix's request for punitive damages, it
     acknowledges that the Court does not need to resolve the choice-of-law question for purposes of its
23   summary judgment motion as it asserts that "the substantive standards for liability are essentially
     the same" and the primary difference is that Indiana caps punitive damages while Nevada does not.
24   Accordingly, for purposes of this motion, the Court will rely on Nevada law in determining whether
     Hix may proceed with his request for punitive damages.

aspect of the question to be presented to the jury is not merely whether Biomet had knowledge of the asserted defects, but whether it gained that knowledge prior to Hix getting the M2a Magnum implant.  The Court cannot find, as a matter of law, that Hix will be unable to present evidence supporting his request for punitive damages.

**G. Loss of Consortium**

As Biomet is not entitled to summary judgment on all of Hix's claims, it is not entitled to Ms. Hix's derivative claim of loss of consortium

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Leave to File Excess Pages by Defendants Zimmer Biomet Holdings, Inc., Biomet, Inc., Biomet Orthopedics, LLC, and Biomet U.S. Reconstruction, LLC, (ECF No. 299) is GRANTED.

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendants Zimmer Biomet Holdings, Inc., Biomet, Inc., Biomet Orthopedics, LLC, and Biomet U.S. Reconstruction, LLC, (ECF No. 273) is GRANTED in part as to Plaintiff's Claim for Negligent Misrepresentation and is otherwise DENIED.

IT IS SO ORDERED.

Dated: March 29, 2022

_____
ROBERT C. JONES
United States District Judge